**NORTH AMERICAN ROOFING COMPANY, INC., Appellant–Defendant,**

v.

**WESTMONT STEEL, INC., Appellee–Plaintiff.**

No. 37A03–9106–CV–188.

Court of Appeals of Indiana, Third District.

May 18, 1992.

Peter J. Rusthoven, Robert D. MacGill, Janet Barbre Norton, Barnes & Thornburg, Indianapolis, for appellant-defendant.

Lester F. Murphy, Burke, Murphy, Costanza & Cuppy, East Chicago, for appellee-plaintiff.

HOFFMAN, Judge.

Appellant-defendant North American Roofing Company, Inc. appeals the jury's verdict awarding damages to appellee-plaintiff Westmont Steel, Inc.

Two issues are raised for review:

(1) whether the trial judge should have disqualified himself from the case; and

(2) whether the trial court erred in finding the contract between North American Roofing Company, Inc. (North American) and Westmont Steel Company (Westmont) to be ambiguous.

North American moved to disqualify Judge McGraw, or, in the alternative, moved for change of venue from Judge McGraw eleven days before the trial was set to begin. To support its motion, North American attacked the trial judge, touting violations by Judge McGraw of Ind. Judicial Conduct Canons 2B, 3A(4), and 3C(1) of the Indiana Code of Judicial Conduct. North American alleges Judge McGraw lent "the prestige of his office to advance the private interest of others" and conveyed the impression that others were in a special position to influence him. Both are violations of Ind. Judicial Conduct Canon 2(A). Whether Judge McGraw did indeed violate this section is an issue better determined by the Indiana Commission on Judicial Qualifications. However, this Court will examine whether North American's case was jeopardized by Judge McGraw's conduct.

■ North American points out that Westmont's counsel, Lester Murphy, wrote a book entitled "Indiana Medical Malpractice" which was published by Lawyers Co-op in 1987. Judge McGraw reviewed the book for Lawyers Co-op, an act for which he did not receive compensation. Judge McGraw then wrote to the publisher that he would "very highly recommend [Indiana Medical Malpractice] for anyone who is either contemplating medical malpractice work or one who is already involved in the field." Lawyers Co-op quoted Judge McGraw in its advertising materials. This quotation, with Judge McGraw's name attached, was placed under the short biography of the author, Lester Murphy. This Court cannot agree with North American that Lawyers Co-op's use of Judge McGraw's quote shows Judge McGraw has an obvious bias towards Westmont's counsel or conveys an impression that Westmont's counsel was in a special position to influence him.

■ Jud.Canon 3(C)(1) directs that a "judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where: (a) he has a personal bias or prejudice concerning a party...." Once again, Judge McGraw's endorsement of "Indiana Medical Malpractice" for Lawyers Co-op does not demonstrate that his impartiality could reasonably be questioned nor does it show that he had any personal biases for or prejudices against any party or attorney in the case. This Court can only assume from the intense hostility in appellant's brief that appellant has already filed a complaint with the Indiana Commission on Judicial Qualifications to review Judge McGraw's alleged violations.

■ Lastly, North American complains that Judge McGraw committed misconduct in violation of Jud.Canon 3A(4) which forbids judges from engaging in *"ex parte* or other communications concerning a pending or impending proceeding." It is interesting to note that conveniently absent from North American's appellate brief are the facts leading up to this brief communication between Westmont's counsel and Judge McGraw.

On March 18, 1990, the trial court set this case for trial by jury on March 12, 1991. The trial court ordered that discovery be terminated no later than December 12, 1990.

Westmont wrote to North American on April 10, 1990, requesting North American forward at its "earliest convenience some proposed dates" for the taking of depositions of North American's employees, who failed to show when noticed, plus some of Westmont's witnesses whom North American wished to depose. The discovery cutoff date was noted.

On July 30, 1990, Westmont wrote North American asking when it would make available its witnesses and when it would like to depose Westmont's witnesses. Westmont suggested various dates in both September and October 1990.

Westmont again attempted to obtain deposition dates by letter on August 22, 1990.

Westmont urged North American to respond immediately as the time to complete discovery was becoming limited.

On September 18, 1990, Westmont confirmed that a deposition of a North American witness had been set and requested that North American schedule the depositions of Westmont witnesses. October dates were suggested for the depositions and once again North American was reminded that the discovery deadline was December 12. North American was advised that Westmont's counsel was in trial December 10–12. Westmont concluded by saying "[w]e need to get your depositions of our people scheduled now so that we are not running around at the last minute with conflict problems."

However, Westmont's letter of October 29, 1990 indicated that North American still had not confirmed dates when it wanted to take the depositions of Westmont's witnesses. Westmont again notified North American of certain conflicts it had in November and December but suggested December 3 and 4 and/or December 5 for the depositions. North American was also reminded that the witness list, exhibit list, and contentions were due on November 12, 1990.

On November 12, 1990, Westmont sent North American its contentions, list of witnesses and list of exhibits. Westmont reiterated that it was holding open December 3 and 4 and/or 5 for depositions.

Westmont sent a fax to North American on November 14, 1990, advising that North American's noticed depositions of Westmont's witnesses for December 10–12 were not possible due to the fact that Westmont's counsel had a trial conflict those days. Alternative days were suggested.

On November 16, 1990, North American filed its motion to enlarge discovery requesting to depose Westmont employees and former employees. Westmont filed an objection to North American's motion setting forth the above background, plus documents of the correspondence.

Westmont sent another fax to North American on November 19, 1990, suggesting more alternative dates for depositions.

This fax was in response to North American's fax on November 16, 1990, which consisted of one statement: "Lester, we are unable to agree to depositions on December 3, 4, or 5."

The trial court heard argument on North American's motion to enlarge discovery on December 3, 1990. The motion was denied.

North American deposed Westmont employees on December 6 and 7, 1990. On December 10, 1990, North American filed a new witness list, setting forth six new witnesses, including experts. This list was filed a month after the cut-off date for the submission of such witness and exhibit list and only two days before the discovery deadline, while Westmont counsel was in trial. Simultaneously, North American noticed two depositions for December 12, 1990. North American also filed a request for production together with a request for entry upon land for inspection by North American's new expert. North American's December 13, 1990 answers to interrogatories stated the name of its new expert, Barry Sanderson, but stated he had not formulated any opinions as of yet since he had not inspected the roof.

On December 31, 1990, Westmont filed its motion to strike the new witness and exhibit list filed by North American on December 10, 1990.

On February 11, 1991, North American filed a proposed pretrial order containing Westmont's contentions and North American's contentions. North American's attorneys prepared and signed such pleading.

A pretrial hearing was held on February 19, 1991, at which a record was not made. However, pursuant to the trial court's order, Westmont mailed to North American its six-page opinion of its expert on February 22, 1991.

On February 22, 1991, Westmont's counsel spoke to North American's counsel to schedule the deposition of North American's expert Barry Sanderson, who had not been made known until mid-December and who had not formulated any opinion before the discovery cut-off date. North American's counsel stated that they wanted to

take the deposition of Westmont's expert. Westmont counsel advised that it was his understanding that the trial court had ruled at the pretrial conference that North American could not take the deposition of Westmont's expert, but Westmont could take the deposition of North American's expert. (Westmont had already complied with the trial court's order to send North American a summary of its expert's opinion.) North American's counsel disagreed.

On February 25, 1991, North American counsel contacted Westmont's counsel insisting that depositions could be taken of Westmont's experts. Westmont counsel suggested that both counsel contact the trial judge. North American counsel agreed to call later that afternoon to "set something up with the Judge." However, instead, Westmont's counsel received a fax later that afternoon from North American's counsel noticing the depositions of Westmont's experts for February 28, 1991. North American advised that Westmont's experts would be deposed first and, thereafter, North American's expert would be available for deposition. Westmont's counsel attempted to contact the judge but he was not in his office. Westmont's counsel left a message.

The next morning Judge McGraw returned Westmont's call. Judge McGraw was informed that North American had noticed the depositions of Westmont's experts. The judge advised that he *had* ruled that Westmont was to provide summaries of its experts' opinions and North American was to make available its expert for deposition. The trial judge immediately sent out his order in written form:

"Defendant having orally moved to take the depositions of plaintiff's expert prior to the commencement of this trial, and the court having considered said oral motion, finds this is an extension of the discovery, and therefore, in compliance with the previous order of this court, oral motion to take the deposition of plaintiff's expert is denied."

This order parallels what Westmont contends occurred. The trial judge had already denied North American's oral motion to depose Westmont's expert; however, the order was never sent to counsel in written form. Subsequently, in violation of the court's oral order, North American attempted to circumvent the ruling by avoiding Westmont's request to contact the judge together and then quickly faxing notices of depositions of Westmont's experts. This is reprehensible behavior. It is even more appalling that North American now complains about the contact between Westmont and the trial judge when clearly North American created the entire situation. Contrary to North American's contention, the trial judge did not make his ruling for the first time when contacted by Westmont counsel. The trial judge simply concurred with Westmont's counsel that North American's oral motion to depose Westmont's experts had been denied at the pretrial conference and then sent out a written order to the effect.

■ North American also attempts to show the trial judge's bias towards Westmont's counsel through the preliminary instruction given by the trial judge. Ind. Trial Rule 51(A) requires the trial court to instruct the jury as to the issues for trial. As pointed out by Westmont, this "stunningly inflammatory" preliminary instruction contained the contentions of *both* parties and was prepared and submitted by North American to the trial judge as its proposed pretrial order. In reading the instruction, the trial court told the jury which of the contentions were Westmont's contentions and which were North American's contentions. Furthermore, the trial court prefaced the reading of contentions by cautioning the jury that these were only the contentions of the parties, not evidence, and were only being given so that the jury would have some idea of the issues that were being litigated. The responses of the jurors were not unusual for this type of contract case; some of the jurors felt that Westmont should have received a leak-proof roof after signing a contract for a new roof and that it would be difficult for them to believe that North American ful-

filled its end of the bargain.[1] Additionally, Westmont presented evidence consistent with the contentions. This preliminary instruction did not prejudice North American.

North American argues in its second issue that its contract was not ambiguous. A contract is ambiguous only if a reasonable person could find its terms susceptible to more than one interpretation. *Turnpaugh v. Wolf* (1985), Ind.App., 482 N.E.2d 506, 509. North American contests the trial court's finding that the contract, drawn by North American, was ambiguous in three particulars: (1) "Whether or not North American Roofing had unlimited authority to remove insulation and/or metal decking at an additional charge without prior approval of Westmont Steel"; (2) "Whether Two Dollars Eighty-five Cents ($2.85) per square foot for the replacement of the steel decking included replacement of the insulation with the decking"; and (3) "Whether the removal of the sky lights, ventilators and their curbs and/or the making of them water tight by covering them with rubber type roofing membrane was required by the contract."

The relevant portions of the contract read as follows:

"ROOF SQUARE FOOTAGE: Approx. ~~144,058~~ 150,148  TYPE SYSTEM: North American Adhered Perma–Lok

PRICE: The Roofing Contractor agrees to furnish all materials, equipment and labor for aforedescribed work (unless otherwise stated) for the sum of: One Hundred Sixty–Four Thousand Nine Hundred Dollars ($164,900.00).

\*    \*    \*    \*    \*    \*

Subject to the terms and conditions hereinafter stipulated, the undersigned hereinafter referred to as 'Roofing Contractor' agrees to:

*BASE BID*

1. Prepare existing roof for installation of new roofing system.
2. Provide and mechanically anchor recovery board over existing built-up roof as per roofing manufacturer's specifications.
3. Provide and install the North American Roofing Systems, Inc. EPDM Adhered Perma–Lok Roof System per North American Roofing Systems, Inc. specifications.
4. Provide building owner with a 10 year labor and material warranty from North American Roofing Systems, Inc. per attached warranty.
5. Remove all existing non-functional curbs and fill back in to reroof.

NOTE: Tear off and remove existing built-up roof and insulation down to, but not including, deck. Fill void created by tear-out with insulation level with existing roof thickness. To be completed on an 'as-needed' basis only, where moisture content of existing roof system is greater than acceptable levels.

PRICE: Add $1.23/square foot

\*    \*    \*    \*    \*    \*

ALTERNATE # 1:

Replace any existing steel deck found to be deteriorated, rusted or damaged.

PRICE: $2.85 per square foot"

■ Certain of the extra work, specifically the removal of built-up roof and insulation, was to be done on an "as-needed" basis. Deteriorated, rusted or damaged deck was also to be replaced. North American asserts it could do the extra work as it believed necessary without prior approval, while Westmont argues that prior approval was necessary. Certainly, the contract does not provide the definition of "as-needed." The contract is absent of any interpretation of "as-needed" and just as North American argues that if prior approval was necessary the contract should have so stated, Westmont contends that if North American had been given carte blanche to decide "as-needed" work, the contract should have so provided. The same logic applies to the replacement of the deck; there is no indication in the contract as to whether North American could make whatever replace-

---

**1.** North American does not ask this Court to review whether the trial court erred in refusing to excuse certain jurors upon the request of North American's counsel. The only issue presented is whether the preliminary instruction prejudiced North American.

ments it felt necessary without consulting Westmont.

Therefore, a determination must be made as to whether a reasonable person could interpret the contract as requiring prior approval before extra work would be done. This Court finds that a reasonable person could interpret these provisions in more than one way. It is not an unreasonable interpretation, as North American asserts, for Westmont to believe that North American would consult it before doing additional work that North American felt was needed. In fact, it is not uncommon for a contractor to consult with the client on additional work which increases the contract price. The clauses are ambiguous and, therefore, the trial court properly sent the clauses to the jury to determine whether prior approval was necessary. Obviously, the jury believed prior approval was necessary as evidenced by its verdict in favor of Westmont.

■ As to the second clause, the trial court determined was ambiguous, Westmont argues that it believed the $2.85 per square foot was inclusive of all work to that point. In other words, Westmont believed that the work for $1.23 per square foot, in addition to the work under alternate # 1, would total $2.85. North American asserts that the work for $1.23 per square foot was completely separate from the additional work in alternate # 1, which cost an additional $2.85. Once again, there is nothing in the contract which would aid this Court in determining whether the $2.85 was additional or inclusive. It was not unreasonable for the trial court to rule this clause ambiguous. Reasonable persons could differ on whether the work done through alternate # 1 was $2.85 or whether the work done through alternate # 1 was separate from and additional to the work done for $1.23.

■ Lastly, the trial court found that the contract was ambiguous on whether the skylights, ventilators and curbs were to be removed and/or made water tight. First, the size of Westmont's roof, including the skylights, is approximately 150,000 square feet. The skylights cover an area of approximately 10,000 square feet. Therefore,

if the skylights were not to be included in the reroofing contract, the roof square footage would have been approximately 140,000 square feet rather than the 150,148 square feet listed in the contract. The contract also called for the removal of "all existing non-functional curbs and fill back in to reroof." These curbs only existed around the skylights and ventilators. North American argues that the specifications only called for "flashing" around the skylights and ventilators and, therefore, Westmont should not have expected more. However, the terminology in the contract could make a reasonable person question what was to be done with the skylights and ventilators. Since more than one interpretation could arise regarding what was to be done with the skylights and ventilators, the trial court did not err in finding an ambiguity.

As for the final instructions North American charges are erroneous, North American bases this argument on the premise that the contract was unambiguous and/or North American was owed money by Westmont. Since this Court finds that the contract was ambiguous and from such the jury determined that North American was not owed money, these issues need not be addressed.

Affirmed.

STATON and BAKER, JJ., concur.